IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOHN BAKER,<br><br>               Plaintiff,<br><br>vs.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>               Defendant. | **8:20CV315**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on defendant Union Pacific Railroad Company's ("U.P." or "the Railroad") motion for summary judgment, Filing No. 365. The plaintiff, John Baker, alleges that U.P. violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, as amended by the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008), when it imposed work restrictions that prevented him from returning to work for a year after a fitness-for-duty assessment. He alleges he is a victim of U.P.'s discriminatory fitness-for-duty policies and practices. He asserts disparate treatment and disparate impact claims of disability discrimination, failure to accommodate, impermissible medical examination under 42 U.S.C. § 12112(d)(1) and (4) and violations of the genetic information nondiscrimination act, 42 U.S.C. § 2000ff *et seq.* U.P. denies the plaintiff's allegations and asserts affirmative defenses of business necessity and direct threat. It contends the plaintiff's medical condition posed a significant risk to his or to others' health and/or safety and the risk could not have been eliminated or reduced by a reasonable accommodation.

In its motion for summary judgment, U.P. first argues that Baker's disability claim fails as a matter of law because he cannot show discriminatory intent. It argues that the

1

evidence shows as a matter of law that U.P made a reasonable medical judgment. It also argues that Baker lacks statistical evidence necessary to support a disparate impact claim and he cannot identify any facially neutral employment policy that caused him or anyone else to be screened out because of a disability. Further, the Railroad argues that Baker's failure to accommodate claim cannot advance because he admits that he proceeds only under the "regarded as" theory and his unlawful medical inquiry and genetic information claims fail because the fitness-for-duty review was appropriately narrow, and Union Pacific took no action based on any genetic information.

U.P. argues that the only true dispute in this case is whether a four-month restrictive period, advocated by the plaintiff's experts, or a 12-month period of restrictions, imposed by U.P. medical experts is objectively reasonable. It argues that the duration of those restrictions cannot be grounds for disability discrimination when all that separates experts' opinions on both sides is a few months.

In response, the plaintiff contends he can prove that U.P.'s decision to remove him from his job for a year was based on a misdiagnosis of his medical condition that was objectively unreasonable. It argues the case should be allowed to proceed to a jury.

I. FACTS

The following facts are gleaned from the parties' respective statements of undisputed fact and from the record.[1] *See* Filing No. 366, defendant's brief at 3-15; Filing No. 373, plaintiff's response at 2-21; Filing No. 381, defendant's reply brief at 2-17. The parties agree that Baker began working for Union Pacific in 2004, most recently as a switchman. A switchman is responsible for traffic control, hostler operations, and other

---

[1] Generally, statements without a citation to the record are facts agreed on by the parties in their respective statements of undisputed facts.

2

general train services. A switchman breaks down and builds up trains that arrive in the yard. The job requires climbing on and off train cars and locomotives. Filing No. 366-2, Deposition of John Baker ("Baker Dep.") at 35. The switchman's written job description identifies the essential functions of the position, including riding on moving railcars; operating locomotives between different shop locations; operating track switches to route train cars. Filing No. 366-4, Ex. 1C, job description. In the fall of 2014, Baker was working as a hostler in Little Rock, Arkansas. Filing No. 373-2, Declaration of John Baker ("Baker Decl.") at 1. His job duties included attending to the switches in a railroad yard, breaking down trains and switching trains from one track to another. *Id.* In a team, he took turns, with one team member operating the locomotive and the other working on the ground of the train yard. *Id.*

In his complaint, Baker alleges that in the fall of 2014, he experienced lightheadedness on a couple of isolated instances outside of work and underwent medical testing to investigate the incidents. Filing No. 341, Amended Complaint at 7; *see also* Filing No. 373-2, Baker Decl. at 1. On November 5, 2014, Baker reported having headaches and dizziness and informed U.P. that his doctor had recommended that he not operate heavy machinery while undergoing testing. Filing No. 368-12, Ex. 2B, Medical Comments History at 6. On November 6, 2014, Baker provided Union Pacific with a note from his treating physician, Dr. Robert Silzer. *Id.*

Pending the results of the medical testing, Baker asked Union Pacific to be temporarily removed from the list of qualified hostlers. Filing No. 373-2, Baker Decl. at 2. Rather than doing so, Union Pacific took Baker completely out of service without pay. *Id.* U.P. sent Baker a letter dated November 6, 2014, stating that he would require a fitness

3

for duty review prior to his return to work, in accordance with U.P. Safety Rule 90.4. Filing No. 368-3, Ex. 1G.

In connection with its evaluation, U.P. requested medical records including "diagnostic study reports including lab work (medication levels), EEG (awake and/or sleep deprived), Tilt table test, CT scan, MRI, etc.;" "physician clinic notes (also known as office notes or progress notes) from the provider treating [him] for this condition" and a "[l]ist of current medications." Filing No. 368-3, Ex. 1G, U.P. letter. U.P. was provided records that showed that in May 2013, Baker had been seen in an emergency room because he felt "weak and tired." Filing No. 368-11, Ex. 2A at 14-16. He denies that he lost consciousness and the emergency room discharge instructions identified "dehydration" as the reason for his visit. *Id.* Under the category, "clinical impression," the physician checked "CVA (stroke);" "pneumonia;" and "syncope." *Id.* He had blood work and a CT scan which were normal. *Id.* at 16. Baker was instructed to drink plenty of fluids. *Id.* His wife reports that he did not lose consciousness. Filing No. 373-4, Declaration of Jessica Baker.

On August 26, 2013, Baker was seen by cardiologist Scott Davis, M.D., for, what he contends was, a follow up visit. Medical records indicate his chief complaint was syncope/near syncope. Filing No. 368-11, Office consult record at 1. At that visit, Baker complained of "feelings of loss of consciousness" that began three months earlier and had occurred only once. *Id.* at 1. The office notes state that the patient reported extreme fatigue, confusion, gait disturbances and slurred speech with the episodes, but Baker disputes that he made that statement. Filing No. 368-11, Office Consult record at 1; Filing No. 373-3, Second Declaration of John Baker at 1. The doctor's notes indicate that Baker

4

had no TIA or stroke-like symptoms. Filing No. 368-11, Office Consult record at 1. An echocardiogram performed that day was normal and Dr. Davis ordered a stress test using Bruce protocol and a 48-hour Holter test. Id. at 2. Later medical records showed the cardiac work up results were normal. Id. at 4-5. Baker later underwent "head up tilt table" (HUTT) testing in November 2014 and "the test was negative for any suggestions of neurocardiogenic syncope." Id. at 7. The attending Electrophysiologist, Blake Norris, M.D., suggested that Baker increase sodium and fluid intake for volume expansion. Id.

In October 2014, Baker was seen by a neurologist, Dr. Robert Silzer, reporting episodes of dizziness, confusion and a "staring spell with delirium witnessed by his wife" one month earlier that Baker did not remember. Filing No. 368-1, Ex. 1D at 1. Baker had symptoms of fatigue malaise and night seats. Filing No. 368-1 at 3. Baker's wife, a certified registered nurse anesthetist (CRNA), reported to Dr. Silzer that Baker "look[ed] postictal after these events." Filing No. 368-1 at 1. Although Dr. Silzer's records identify his diagnosis as "syncope," Dr. Silzer explained that a "spell" is a more accurate term but there is no International classification of diseases ("ICD") code for a spell, so a doctor has to come up with the closest to get a workup going that the insurance company would be happy with." Filing No. 375-14, Ex. 1E, Deposition of Robert Silzer ("Silzer Dep.") at 16-17. He testified that "syncope" is passing out and loss of consciousness" but that "to say that [Baker was having true syncope and he was passing out is —I mean if you have read my notes you know that is not exactly the case." Id. at 16. Dr. Silzer stated that agreed that "what Mr. Baker had was not necessarily syncope, but just a spell that could not be diagnosed as a black-and-white condition." Id. at 20. Dr. Silzer also stated that Baker did not have any seizures. Id. at 51.

Dr. Silzer advised that Baker needed additional neurological testing and recommended that during the time of neurological testing that Baker refrain from driving and operating heavy machinery.  Filing No. 368-2, Exhibit 1F at 1.  However, Dr. Silzer did not impose total restrictions.  Id.

Dr. Silzer's office notes of a visit on November 18, 2014, indicate that Baker presented with a history of "spells."  Filing No. 368-4, Ex. 1H at 11.  Dr. Silzer did "not have a definitive [diagnosis]," and advised that "[a]s a precaution, [Dr. Silzer] would like [Baker] to remain off of work until early Jan[uary]."  Id. at 13.  Dr. Silzer's notes further state Baker was "asymptomatic," that he would be "reviewing [Baker's] 72-hour EEG as soon as [he received] it[,]" and, that he "anticipate[d] that Plaintiff will [] return to work shortly after the first of the year."  Id.  Dr. Silzer testified that this two-month restrictive period was "sort of arbitrary," but the longer that Baker went without a "spell" the less likely he would have one in the future.  Id. at 44-45.  Dr. Silzer testified it "adds credence to the thought that, you know, the guy[']s going to be fine down the road" especially because Baker was a "young," "otherwise completely healthy normal guy" who had undergone "extensive neurological testing."  Id.

On January 15, 2015, Baker, described in U.P. records as "Switchman/brakeman with syncope" submitted medical records for return to work.  Id. at 5.  U.P. determined he was not fit for duty and requested additional records, noting the "it is very likely that long term restrictions are going to be appropriate, but we will determine that after we have all the records."  Id.

Baker visited Dr. Silzer on January 6, 2015.  Filing No. 368-4, Ex. 1H at 1.  Office notes indicate that Baker's symptoms "varie[d]" but included "floating sensation, light-

headed, nausea and spinning." *Id.* Dr. Silzer stated that Baker's last spell was in September 2013 and he had been asymptomatic since that time. *Id.* He reported that Baker's recent 72-hour EEG was normal. *Id.* Dr. Silzer noted that Baker "had an extensive [workup] with normal findings" and stated, "as a precaution he should return to light duty later [that] month, and after 30 days, if he is free of spells, then resume his normal job duties." *Id.* at 3. Dr. Silzer testified that if a patient, like Baker, has "spells" without a clear epilepsy diagnosis, then the appropriate restrictive period from "performing an activity or working in any particular capacity is really sort of up to the judgment of the physician." Filing No. 366-5, Ex. 1E, Silzer Dep. at 51-52. That same day, January 6, 2015, Dr. Silzer drafted a note stating that Baker could return to work three weeks later and should then perform thirty days of "light duty," refraining from driving or operating heavy equipment during that time. Filing No. 368-5, Ex. 1I at 1.

Dr. John Charbonneau, Union Pacific's Assistant Medical Director, oversaw Baker's FFD review. Filing No. 366-11, Dr. Charbonneau Dec. at 1. Dr. Charbonneau did not physically examine Baker and no doctor at U.P. spoke with or examined Plaintiff during the fitness-for-duty review. Filing No. 373-3, Second Baker Decl. at 2. U.P.'s Chief Medical Officer at the time, Dr. John Holland, was responsible for the decision. Filing No. 375-5, Ex. 31, Dr. Charbonneau Dep. at 47.

The record shows that U.P. received records from Dr. Silzer's office, including the work release, on January 15, 2015. Filing No. 368-4, Ex. 1H at U.P. 00739, 00741; Filing No. 368-5, Ex. 1I; Filing No. 368-12, Def. Ex. 2B at U.P. 005163–64. The next day, Dr. Charbonneau wrote that Plaintiff was "NOT FFD [fit for duty]." *Id.*, Medical Comments History at 5. He stated Baker had not submitted any ER records or his initial neurology

7

Clinic visit "so it is difficult to know how many syncopal episodes [Baker] has had or how precipitous/severe his episodes have been." *Id.* He did not note Baker's clearance to work. *Id.* Instead, he wrote: "[i]t is very likely that long term restrictions are going to be appropriate[.]"). *Id.* U.P. then extended Baker's medical leave of absence until early April 2015 and requested all emergency records from the syncopal episodes; initial and follow up neurology clinic notes; and the results of any additional diagnostic testing. Filing No. 368-6, Ex. 1J. U.P. received additional records from Baker in early February 2015, although Dr. Charbonneau stated that he still did not have certain neurological records. Filing No. 368-12, Ex. 2B, Medical Comment History at 4.

Baker provided additional records on February 3, 2015. Filing No. 368-11, Ex. 2A at 1. Dr. Charbonneau stated that the records U.P. had received provided "more confusion than clarity." Filing No. 368-12, Ex. 2B, Medical Comment History at 4. Dr. Charbonneau noted that the records referenced a "loss of consciousness," but the diagnosis for Baker's condition varied between "syncopal/near syncopal episode" and "dehydration." *Id.*

Near the end of February 2015 Union Pacific received all of the neurological records that it had requested from Baker. Filing No. 368-12, Ex. 2B at 4. Dr. Charbonneau determined that the additional neurological records showed that Baker had suffered another "episode" in the "September 2014 time frame." *Id.* at 3. He concluded that Baker had "multiple spells most consistent with syncope." *Id.* He imposed "sudden incapacitation restrictions for one year from the estimated date of the last episode, approx. 9/14/14." *Id.*

Chief Medical Officer Dr. Holland concurred that, in his opinion, Plaintiff had syncope with no known cause, and it was reasonable to restrict him for a year. Filing No. 375-11, Ex. 37, Deposition of John Holland, M.D. ("Dr. Holland Dep.") at 376-82; Filing No. 376-1, Ex. 5, Rebuttal Report of John Holland, M.D. ("Dr. Holland Rebuttal Rep't") at 17. Dr. Holland explained that "it is reasonable to have a minimum waiting period before return to safety critical work for an individual who has had a [loss of consciousness] episode of unknown cause." *Id.* at 18.

In October 2015, Baker visited Dr. Silzer, who reported that Baker had been episode-free for one year and could return to work. Filing No. 368-10, Ex. 1N, Office notes at 4. Baker submitted Dr. Silzer's new records to Union Pacific. Filing No. 366-2, Ex. 1A, Baker Dep. at 119. Union Pacific informed Baker that he was medically cleared to work with no restrictions on October 29, 2015. *Id.* at 119-20. Baker chose to return to a slightly different position although with similar duties and a higher salary than his prior switchman position. *Id.* at 120.

Baker's retained expert, neurologist Dr. Michael Devereaux, states that, based on his review of Baker's medical records, Baker "certainly did not have multiple syncopal events as suggested by Union Pacific. Indeed, he does not appear to have definitely had any syncopal events, only one near-syncopal event." Filing No. 376-12, Ex. 27 Report of Dr. Michael Devereaux, M.D. Dr. Devereaux testified "he's probably the safest person at the railroad company that they have because he's had this enormous workup and they haven't found anything." Filing No. 375-6, Ex. 32, Deposition of Michael Devereaux, M.D. (Dr. Devereaux Dep.") at 39. He testified Baker's removal was "excessive" and "punitive." *Id.* at 47-48. Dr. Devereaux testified that he disagreed with Dr. Charbonneau's

observation that "the only way [Baker's neurologist's recommendation of return to work with one month of light duty] would make sense [was] if the employee had some type of additional episodes[,]" stating,

> Well, because this is just all supposition. He didn't talk to the doctor. The tests are all negative and his neurologist recommended return to work. And he's saying the only way this would make sense is, as I gathered, he had done a 72-hour EEG and he's had a normal EEG, all of this is normal, there must be something going on to have done all of this testing. That's how I interpret what this physician is saying. So, he's sort of being punished in a sense for a negative workup.

*Id.* at 55. Baker's other retained expert, Dr. Kevin Trangle, a board-certified environmental medicine, internal medicine, and occupational medicine physician, believes that Union Pacific could have returned Baker to work in January 2015. Filing No. 366-9, Ex. 1R, Deposition of Kevin Trangle, M.D. ("Dr. Trangle Dep.") at 421. Dr. Trangle testified:

> As far as I know, there's only one documented episode. The others are some conjecture that he had had more than one. I don't really see that documented. . . . In the one that we have documentation from, it appears to be dehydration in partial, and not really true syncope, but partial syncope.

*Id.*

Defendant's former Chief Medical Officer, Dr. John Holland, testified that since he became Chief Medical Officer in 2010, he wrote and implemented evidence-based guidelines in connection with employees' "fitness for duty." Filing No. 375-11, Dr. Holland Dep. at 400-402. He stated he views this approach to fitness for duty as a "new paradigm" in the field. *Id.* at 245-47. One of the central tenets of Union Pacific's new approach is a "1% Rule" regarding an employee's risk of sudden incapacitation. *Id.* at 296-301; Filing No. 375-9, Ex. 35, Rule 30(b)(6) Deposition of John Holland, M.D. ("Dr. Holland 30(b)(6)

Dep.") at 183; *see also* Filing No. 376-3, Ex. 9, Changes in work restrictions for U.P. workers with seizures dated 6/23/2015 at 2.

Holland testified the policy is based on guidelines from the FMCSA, which apply to commercial truck drivers and not to railroads. Filing No. 375-9, Ex. 35, Dr. Holland 30(b)(6) Dep. at 118, 130, 133. The railroad industry does not have a comprehensive medical standards program. Filing No. 381-1, Ex. 4, Dr. Holland Dec. at 1; Filing No. 381-2, Ex. 4A, Medical Standards for Railroad Workers at 6. The Federal Railway Administration failed to adopt any new regulations that incorporated comprehensive medical standards and fitness-for-duty requirements for railroad workers in safety-critical positions. Filing No. 381-1, Ex. 4, Dr. Holland Dec. at 2. In late 2011, in response to the FRA's failure, and influenced by the NTSB's recommendations from railroad accident reports, U.P. changed the criteria under which its Health and Medical Services Department would evaluate a person's fitness for duty for a safety-critical position when he or she had a medical condition that may present a risk of sudden incapacitation. *Id.* In his role as Chief Medical Officer, Dr. Holland provided guidance and input on the medical aspects of these decisions. *Id.* U.P. applied a more restrictive "internal standard" to sudden incapacitation cases involving a loss of consciousness episode of unknown cause than the FMCSA. Filing No. 375-11, Dr. Holland Dep. at 376 (noting the FMCSA Handbook states there is no recommended time frame for syncope with no known cause). U.P. determined that a one-year restriction was reasonable for an episode of unexplained loss of consciousness. *Id.* at 379-81; Filing No. 376-11, Ex. 26, Appendix B: Duration of Work Restrictions by Condition, Fitness-for-Duty Guidelines for Seizures at 5. No doctor

11

at Union Pacific physically examined Baker and nothing in the record suggests that anyone contacted Dr. Silzer.

II. LAW

"Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Fed. R. Civ. P. 56(c)(2)). The court views facts in the light most favorable to the nonmoving party, and makes no determinations of credibility; nor does it weigh the evidence or draw inferences, as those functions belong to the jury. *Cottrell v. Am. Family Mut. Ins. Co., S.I.*, 930 F.3d 969, 971–72 (8th Cir. 2019). A party opposing a properly supported motion for summary judgment may not rest on the allegations contained in the pleadings, "but must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The record must indicate an absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Northport Health Servs. of Ark., LLC v. Posey*, 930 F.3d 1027, 1030 (8th Cir. 2019). Facts that, if altered, affect the outcome of a lawsuit under applicable substantive law, are material. *Cottrell*, 930 F.3d at 972. A material fact dispute is "genuine" if each party has supplied some evidence that is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Anderson*, 477 U.S. at 250. "[C]redibility determinations, the

12

weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions." *Id.* at 255.

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability" with respect to the terms and conditions of employment. 42 U.S.C. § 12112(a). A person is disabled under the ADA if they have "a physical or mental impairment that substantially limits one or more major life activities," has "a record of such an impairment," or is "regarded as having such an impairment." *Id.,* § 12102(1). An individual is disabled under § 12102(1)(C)'s "regarded as" prong "if the individual is subjected to a prohibited action [e.g., firing, demotion] because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity." 29 C.F.R. § 1630.2(l)(1); *see Parker v. Crete Carrier Corp.*, 839 F.3d 717, 724 (8th Cir. 2016) (quoting 42 U.S.C. §§ 12102(1)(C), 12112(a)).

An ADA plaintiff may survive a defendant's summary judgment motion in one of two ways—by presenting either direct or inferential evidence of discrimination. *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1034 (8th Cir. 2007). "'[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'" *Id.* (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (internal quotation omitted); *see Brown v. City of Jacksonville*, 711 F.3d 883, 888 (8th Cir. 2013). In order to obtain relief under the ADA in a case where a defendant admittedly made the decision because of the disability, a plaintiff must show: (1) he or she is a 'qualified individual'

13

under the ADA, (2) he or she suffered discrimination as the term is defined by the ADA, and (3) the discrimination was based on disability as defined by the ADA. *Brown v. City of Jacksonville*, 711 F.3d 883, 888 (8th Cir. 2013); *see* 42 U.S.C. § 12112(a).

Without direct evidence of disability discrimination, a plaintiff's claim falls under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). Under that paradigm, the plaintiff first has the burden of establishing a prima facie case: (1) that the plaintiff was disabled, or regarded as disabled, within the meaning of the ADA; (2) that the plaintiff was qualified to perform the essential functions of the job; and (3) there is a causal connection between an adverse employment action and the disability. *Id.* If the plaintiff fails to establish any element of his prima facie case, summary judgment is proper. *Kellogg v. Union Pac. R. Co.*, 233 F.3d 1083, 1086 (8th Cir. 2000); *see Parker v. Crete Carrier Corp.*, 839 F.3d 717, 724 (8th Cir. 2016) (involving "regarded as" claims). If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for the adverse action. *Parker*, 839 F.3d at 724. If the employer makes such a proffer, the burden shifts back to the plaintiff to show that the employer's stated reason is a pretext. *Id.*

The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Essential functions are the "fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1). To the extent that an employer challenges an ADA plaintiff's claim that he can perform the job's essential functions, the burden of production is on the employer to come forward

14

with evidence of those essential functions. See *EEOC v. Wal-Mart*, 477 F.3d 561, 568 (8th Cir. 2007). "'Whether a function is essential is a question of fact, not law.'" *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 634 (7th Cir. 2020)(quoting *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020)*; see also Cripe v. City of San Jose*, 261 F.3d 877, 888 n.12 (9th Cir. 2001) ("A highly fact-specific inquiry is necessary to determine what a particular job's essential functions are."). Although courts "usually do not 'second-guess the employer's judgment in describing the essential requirements for the job'" that "deference is not unqualified." *Mlsna*, 975 F.3d at 634 (quoting *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998)).

Discrimination also includes the use of "qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability." 42 U.S.C. § 12112(b)(6). Qualification standards include "medical, safety and other requirements established by [an employer] as requirements . . . to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q). Such a qualification standard may include a requirement that an individual does not pose a direct threat to the health or safety of other individuals in the workplace. *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002); *see* 42 U.S.C. § 12111(3); 29 C.F.R. § 1630.2(r).

There is a two-step analysis under this provision. *Cripe*, 261 F.3d at 886. The first step requires an examination of whether the defendant's qualification standards screen out or tend to screen out disabled individuals. *Id.* At this first step, there is an affirmative defense available to defendants—they may rely on qualification standards that "include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." *Id.* (quoting *Echazabal*, 336 F.3d at 1027). The second

15

step requires an examination of whether the defendant's qualification standard falls within the business necessity exception. *Id.*

An employer bears the burden of proof on the ADA direct threat defense as it is considered an affirmative defense.[2] *EEOC v. Wal-Mart*, 477 F.3d at 571 (noting that summary judgment in favor of an employer may be appropriate on an ADA claim if an employer can satisfy its burden to show that an employee presents a direct threat to the health or safety of other individuals in the workplace). To establish the direct threat defense, "[t]he Supreme Court requires an individualized analysis that relies on the 'best current medical or other objective evidence' in order to 'protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear.'" *Id.* (quoting *Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243, 1248 (9th Cir. 1999)). The defense "must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended." *Echazabal*, 536 U.S. at 86 (quoting 29 CFR § 1630.2(r) (2001)). The assessment considers specific factors that include: (1) the duration of the risk, (2) the nature and severity of the potential harm, (3)

---

[2] In the Eighth Circuit, an employer's safety concerns are not part of the prima facie case for disability discrimination, but whether an individual poses a danger to himself or others is relevant for evaluating the employer's affirmative defense of direct threat. *EEOC*, 477 F.3d at 571–72. Some courts discuss "direct threat" in terms of whether an individual is qualified, rather than treating it as an affirmative defense, finding that an individual is not qualified if he presents a "direct threat" to his own health and safety or that of others. *See e.g., Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 25-26 (1st Cir. 2002); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996); *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 763-64 (5th Cir. 1996); *Michael v. City of Troy Police Dept.*, 808 F.3d 304, 307-08 (6th Cir. 2015); *Bodenstab v. County of Cook*, 569 F.3d 651, 658 (7th Cir. 2009); *McKenzie v. Benton*, 388 F.3d 1342, 1353-55 (10th Cir. 2004); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835-36 (11th Cir. 1998).

16

the likelihood that the potential harm will occur, and (4) the imminence of the potential harm. *EEOC v. Wal-Mart*, 477 F.3d at 571.

The ADA requires an interactive process between the employer and the employee—a cooperative dialogue to identify the precise limitations resulting from the disability and "explore the existence and feasibility of reasonable accommodations." See *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114-1116 (9th Cir. 2000).

III.   DISCUSSION

The Court first rejects U.P.'s argument that Baker's action is barred because he cannot prove he is disabled under the ADA. He brings this action as one with a record of disability and the record supports that position. He clearly has a record of disability in that he was removed from his safety-sensitive position for over a year by reason of a report of ill health. Also, he suffered an adverse employment action because U.P. regarded him as disabled by reason of a risk of sudden incapacitation. Although, Baker contends, he never had true syncope, the record indicates that the railroad regraded him as having had one or more episodes of loss of consciousness. Baker has presented evidence from which a jury could conclude that he has a record of disability or was regarded as disabled.

U.P.'s argument that Baker has not presented a prima facie case is also misplaced. The record shows there is direct evidence of discrimination because the defendant admittedly made the decision to remove him from work for a year based on his perceived syncope. The *McDonnell-Douglas* burden shifting paradigm is not applicable. Even if it were, the question of whether Baker can perform his job safely, so as to be qualified for the position is not part of a plaintiff's prima facie case but goes to whether the Railroad

17

can prevail on its direct threat defense. Viewing the evidence in the light most favorable to Baker, the Railroad has shown as a matter of law that the temporary restrictions it imposed on Baker were necessary or reasonable before the plaintiff's physician released him to light duty. The Railroad has not shown as a matter of law that the temporary restrictions were necessary or reasonable, thereafter.

U.P. was in possession of records that showed that his first ostensible loss-of-consciousness episode was the result of dehydration. That episode predated his removal from work by more than a year. The plaintiff contends he never had "true syncope" and evidence supports that contention. Baker's treating neurologist, Dr. Silzer, cleared the plaintiff to work, first on October 16, 2014, and then again on January 26, 2015. U.P.'s Health and Medical Department imposed restrictions that prevented Baker from working for one year. There are genuine issues of fact on whether the railroad's imposition of that restriction was reasonable. Evidence suggests that the conclusion that Baker posed a risk to safety was based on an assumption that Baker would not have undergone testing if he had not suffered additional episodes of loss of consciousness. Importantly, Baker had undergone extensive cardiac and neurological testing with normal findings. Medical experts disagree on the duration of the restrictions imposed on Baker. The Court finds that there is a triable issue of fact regarding whether Union Pacific conducted a sufficiently individualized assessment of Baker's ability to perform the essential functions of his position and whether its restrictions were reasonable. It is not the Court's function on summary judgment to resolve conflicting expert testimony. Summary judgment is therefore inappropriate on Baker's disability discrimination claim.

There is conflicting evidence on whether U.P. engaged in an interactive process to accommodate the plaintiff's need for reduced or light work. U.P. has not met the burden of establishing as a matter of law that the plaintiff has no reasonable accommodation claim. The issue requires further factual development. Depending on the evidence as to the job's essential functions, the plaintiff's limitations, and the information conveyed to the plaintiff, a reasonable finder of fact could conclude the plaintiff has a claim for denial of a reasonable accommodation.

There are also questions of fact on whether the criteria that U.P. uses or the manner it conducts its fitness-for-duty evaluations are reasonable. Evidence suggests that U.P.'s mandatory reporting procedures, particularly the 1% rule, are criteria that screen out, or tend to screen out, individuals with a disability for whom a reasonable accommodation should be given.

U.P. has not shown it is entitled to judgment as a matter of law on its affirmative "direct threat" defense. An individualized assessment is required to establish that defense as a matter of law. At this stage of the litigation, U.P. has not shown that Baker posed a significant, present threat to safety after he was cleared for light duty by his treating physician. There is a material dispute on whether such an individualized assessment was performed and whether it was based on objective medical evidence related to the plaintiff's condition and abilities.

There are also issues of fact with respect to whether U.P.'s medical department's fitness-for-duty determination was reasonable in the face of contrary medical evidence. His diagnosis in 2013 was dehydration. There is a considerable conflict in the evidence about whether Baker had experienced a loss of consciousness in 2014. Medical experts

have differing opinions on the issue of the necessity, duration, and extent of duty restrictions.

Viewing the evidence in the light most favorable to Baker, the Court concludes that a reasonable jury could conclude that Union Pacific made an arbitrary decision based on incomplete or flawed evidence and made improper assumptions in reviewing the medical evidence—and that, as a result, Union Pacific's conclusion that Baker posed a safety hazard was not objectively reasonable.

Accordingly,

IT IS ORDERED that:

1. The defendant's motion for summary judgment (Filing No. 365) is denied.
2. The defendant's motion for a hearing (Filing No. 377) is denied.

Dated this 18th day of January 2022.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge